Today's argument calendar, and we'll begin with Appeal No. 23-1662, St. Paul Guardian Insurance and others v. Walsh Construction. Mr. Goodman, good morning. Good morning. Good morning. May it please the Court, I'm David Goodman, and I represent Walsh Construction Company. In 2003, Walsh was the general contractor for an improvement project at O'Hare, and the improvement project was to construct a substantial steel canopy over Terminals 2 and 3, and attached to a glass curtain wall that extended the vestibules. There's a picture of this if you need to see it, ETF 179-3, pages 2 and 3-4. LB Steel fabricated the steel parts from which the canopy was constructed. It was delivered in the parts, the big parts, to O'Hare, and it was constructed by different entities that built the canopy. And in November of 2004, after the canopy had been constructed and was in use, the City found a crack at the base of one of the columns, one of the support columns, and Walsh was required to build shoring around the canopy in the area of that column so that it wouldn't collapse, and an investigation was undertaken to identify whether there were other structural problems among the other 31 columns that were supporting this massive system. And in 2007, it was identified or determined that there were structural welds in a number of the columns that had been supporting the load of the canopy, and the City's engineers determined that as a consequence of the cracks in the structural welds, the canopy structure was not stable, at least it wasn't sufficient to bear the load that it was required to bear. So, Mr. Goodman, let me ask you a question about this. It was my impression, reading the materials here, that the retrofits, I'll call it, that the restorative measures that were undertaken after these problems were discovered really applied only to the columns, that nobody did anything to the canopy, nobody did anything to the wall, the extended shields, and if it really is just measures taken for the columns, why doesn't that fit comfortably inside the Illinois law rule that that's just damage to your own property, not to other property? Well, first off, it actually went beyond, it was all of the supporting structures, so it was the columns, it was also hammerheads that were used to provide support because this was a cantilevered structure, but it was, the columns were no longer separate pieces. They had, from the columns and all the other pieces, they had constructed this canopy, so it wasn't as if you had a column in isolation. It wasn't as if you had a hammerhead in isolation. So can you describe then what was done to the columns? I had the impression that there was reinforcement put around the columns to address the fact that these welds had not held and the kinds of problems you were just describing. Sure, so initially what was done is Walsh was required to build shoring around all of the columns throughout the entire system so that the structure wouldn't collapse. And was this just sort of like an outer envelope around the columns, the shoring? No, the shoring, and there's a picture of it and I can identify it. I'm looking at one picture from the record. The shoring looked like, almost like tees that were built to provide support because the structure as designed and built was no longer able to support itself because the pieces from which the structure had been constructed began to crack. The welds within them, the structural welds that were to provide the support cracked. And so after they were assembled, after they were beginning to bear the weight, so they had to build these shoring, the steel shoring that had to be designed and approved to provide the support that otherwise the columns and the hammerheads would have provided. So is it your theory then that when all is said and done, when the work has been done, that the columns kind of blend into the whole canopy and it's really all just one big product? Yes, it's as if, to my thinking, it's as if somebody had supplied a lot of bolts and the bolts after they were installed into the structure cracked and they were no longer able to provide support and they had to divine a new system to provide the support to replace what had been the plan, what was supposed to happen because the columns were no longer going to function in the manner in which they had been designed and built. They had to come up with a different system. Can I ask you a question on that front? Sure. So it seems to me that these restorative measures and the steel shorings that were put in, they were all about trying to remedy structural instability, right? I think that that's correct. Is that fair? I think that that's right. I mean, there's a place where it's defined as or described as an inability to bear the load. So I think that the two are similar. Yeah, that sounds pretty similar. But there was no, thank God, there was no collapse or anything like that. So the question that I have in looking at this on the coverage issue is let's just use the term structural instability. Sure. Okay. Is structural instability itself, you know, physical damage, you know, property damage? Because that concept of instability seems to get more at risk of damage to property. In other words, if it's not remedied, you very well could have property damage. Well, I don't, I actually, I think that it is tangible damage to physical property. The physical structure itself, a, the load-bearing capacity decline, that's a diminishing, that's a physical property. I think that the structure itself has built the structural stability. If it changes, that's a physical condition of the property, I believe. So how is that different from the Illinois Supreme Court case, Travelers Insurance versus earlier manufacturing, where that dealt with a lot of the, I guess there was plumbing and pumps and whatnot, right, the Quest systems that were installed? Yes. And so the Supreme Court there said that, well, the potential that something might happen is not tangible property damage, right? And sure, the entire home may have decreased in value, and certainly there were risks that, you know, the home would not function as anticipated or because of the Quest systems, but that that wasn't enough. And so I guess going back to Judge Scudder's question, why isn't your use of structural instability just a way of saying that there is an increased potential for the canopy to collapse, as opposed to saying that, you know, there are actually cracks in parts of the canopy other than what LB delivered? I think that there's a significant difference. I think, so in Alger, they had two situations. One situation was sometimes the plastic piping did actually leak in some fashion. Right. It doesn't require a complete fracture with, you know, flooding of a home. It's just a change in physical property. In our situation, you have the structural- Yeah, but in those situations where it actually leaked, you had water that damaged kind of the surrounding property, right? And so you had actual tangible property damage outside of what the insured actually delivered. And so here, I guess, I'm trying to identify what is that tangible property damage that the deficient wells and steel that LB delivered kind of imparted upon the other overall structure? Sure. So from these parts, they built a structure. The structure itself underwent physical changes, was no longer able to – they had to shore or it would have collapsed. But hypothetically, if you replaced everything that LB delivered, then that would eliminate the structural instability, right? Couldn't. I suppose one could have totally dismantled the entire thing and built a new structure. I think a way to think of it is, and a distinction would be, let's say an engineer after the structure was built looked at the design and said, oh, my gosh, there's a design defect in this. There would be a claim, I suppose, against the designer. There might be a professional liability claim, but I don't think that there would be a property damage claim. In this case, they built something from the parts, the parts themselves that were fully integrated. This was no longer columns in isolation. And in fact, if you look at the retrofitting, it wasn't – they couldn't take out a column and replace it with another. They had to make physical changes in the way the whole structure was designed to stand. Because things broke. The columns' welds broke. There were changes. And in fact, the city's complaint against Walsh was that it had to repair the canopy because of the breaking. But I don't take – but I don't – you know, looking at the amended complaints and your briefs, I don't see you arguing that the – I don't think, anyway, that you're positing the argument that the repairs themselves resulted in tangible damage to physical property. And so therefore, as a result of kind of that transitive kind of but-for cause or approximate cause – I guess it would be but-for cause – that therefore, L.B.'s mis-actions caused property damage in that way. I don't think that's the argument you're making, right? The argument is they built something. They built the structure. Cracks in the pieces – the pieces began to fracture. The structure was no longer – it underwent a change, a physical change to the property. That's damage under Illinois law. That's damage under Elger. But why was the canopy on top of it damaged? It certainly didn't have a solid base to sit on. And I mean, I understand that was the problem with all of this cracking. But there was nothing in particular wrong with the canopy. And the Illinois cases, such as the Elger case, probably the leading case, try to dissect out, you know, damage to what you did and damage to another part. There's a recent case, Acuity, that's, I think, pretty clear talking about – and it talks about Elger and it talks about what is damage. Damage is a physical change to the property. The property – it's not like any piece is in isolation. The canopy is – it's the whole thing. The canopy is – all these parts are welded together. It's not like you have a piece in isolation. The steel curtain wall is attached to the canopy. Everything is – But that's often true in these economic loss cases, whether it's an engine on an airplane or whether it's, you know, wheels on a truck or something. It's often true that everything is supposed to work together. But then when you look at which part failed, you ask, did the failure not only affect the defective part but other things? But it did. The structure itself – I mean, thank God they found the crack, the break in the column, so that they could do – begin repairs. Repairs beginning the – including the shoring. I don't want to get nitpicky with your word choice. But let me just ask you the question. You can push back on it, okay? When you say things like break, crack, my impression was these were more like, you know, fissures, hairline fractures that presented the prospect of risk, you know, structural instability. As opposed to, oh, my goodness, look at that beam over there. It's almost cracked in two. Well, you're right. The cracks were at the – Like at the welding points, right? Structural – but those are the pieces. I mean, they're – and ultimately the repairs were not to things like – there are lots and lots and lots of welds. Miles, I forget what the mileage is of the welds. But the cracks were in the things that actually provide the support, the things that ensure the integrity of the structure so that it wouldn't collapse. And as those pieces break, the property of the structure as a whole changed. That's the diminution in the load-bearing capacity of the structure, which is a physical property of the structure. We'll give you some time on – a couple minutes on rebuttal if you want to say what you got left. I appreciate it. Go ahead. Could I ask one more question? Sure. Just to follow up on one of the questions that Judge Wood asked, which is that say you have a – I like the car example, the airplane example a lot. Say you have a car and airplane, and the brakes are defective, right? And certainly you want to make sure that you replace the brakes before the car is driven because you don't want it running over people and things, right? And the brake is an absolute necessary part of the car, right? But if you were just to replace the brakes and if there was no other damage to any other portion of the car, that wouldn't be considered tangible property damage under LGER, right? I agree. And so why is this any different? Because they've – everything – there's a point in – so for example, let's say that columns have been delivered and you looked at the columns and you said, oh my gosh, there are cracks in the welds in the columns. I mean these columns came tested. There weren't cracks when they were delivered. You look at the column and you say, oh, it's defective. Return the column. Once you build something from it and once it's actually bearing load, which is a point in time when you actually had cracks. So to your example, if I'm driving a car and I press the brake, I depress the brake, and – I'm not a very good driver – and somehow I suppose the car slides, you recover. Nothing terrible happens, but there was a problem with the brake. It wasn't functioning as the brake was supposed to function. Again, no problem. Let's say now I hit something or my tire freezes. It's hard to work with a brake example because I don't drive. But I think here the example that I can work with is the structure wasn't as built anymore. It wasn't standing as built anymore. There was a change in the physical property of the structure that was built from the parts as if I provided bolts that cracked and I had to find some way to – because you can't necessarily replace all the bolts. Again, that's how I evaluate or view the damage. Okay, Mr. Goodman. Let's hear from counsel for the insurance companies and we'll come back to you. Thank you. Good morning, Your Honor. Laura Besvinick, Maple Leaf Support, on behalf of the insurer Applebee's. This is exactly what we've been dealing with in the case, and I want to be clear about what L.B. Steel contributed to the canopy. It made all of the steel parts, all of them, the box girders, the hammerheads. I've had to learn about engineering for this. The structural support columns. This project had a lot of problems independent of L.B. Steel and a lot of people were sued, including the designers and engineers and the like. But just in terms of L.B. Steel and what it did, it made the support columns. I think of it as making the Legos, and then the Legos were brought to the airport and they were all assembled and put together. The crack was in the L.B. Steel support columns that were built. That's it. And can you describe from your point of view what the repair efforts addressed? The repair efforts were to repair the welds. So you repaired the welds and did you, I mean not you, somebody, did it happen that maybe extra, the column was enlarged somehow? I don't know all of the engineering, Your Honor. I'm going to be very clear about that. But it's been described as both repair, remediation, and retrofitting. I don't think there's really a difference for purposes of the property damage question. But it was all, though, on the columns. It wasn't in the canopy or on the wall. The glass curtain wall, there's been no suggestion that the damage, the property, the L.B. Steel part of the subcontracting, that it affected some other part of the project. It didn't affect that upper canopy that the cars were driving across on the departure level? No, it's not affecting anything other than the metal parts that were supplied by L.B. Steel. Not the welds that were done by other people. Mr. Goodman, though, was referring to shoring, steel shoring that was brought in at restorative reinforcing. What was that? It was all because of a concern that something might happen. What was done was there was retrofitting, remediation, and repair with respect to these columns in order to keep something from happening, in order to keep there from being property damage. But you're saying, I mean, it's important to me, as I'm understanding your position, we obviously can look at the record and figure this out, that all of these efforts to make sure that no catastrophe occurred were focused on somehow strengthening the columns, addressing the defects that have been found. So they were all focused on the columns themselves. That is correct, Your Honor. That is my understanding. And that's really what was alleged. I mean, if you go into the record, what you'll see in terms of the reports is they said that the stability could be endangered by the cracks. That's what caused the efforts to happen, which is why we cited Elger and why the Elger case from the Illinois Supreme Court is the primary authority that we relied on, which is this is an effort to keep something from happening so that it has not actually happened. That there is not a physical injury to something other than the portion of the project that was actually supplied by L.B. Steele, which were the metal parts. It seems like Mr. Goldman's making an argument, at least the way I perceive it, is that the steel was so integrated into the overall product, right, that you can't really just take it out and replace it. And that's why they needed the shoring, right? And I think to cite that proposition, they rely upon the Case-Pittway Corporation that deals with the aerosol cans, right, with the valves. And there, I suppose, right, there's no evidence that, at least in the record in that case, that the valves did any physical damage to anything outside the valves. It just rendered the whole thing unusable. And there, the Illinois Appellate Court had little trouble finding that that would be property damage, right? And so how is this different from that case? My recollection, and I may have this confused with another case, is that Pittway was distinguished by Elger as only requiring injury to property, not physical injury to property. The other thing is those aerosol cans were made unusable. This structure was never made unusable. It stayed there the entire time. So it's not like throwing away the aerosol cans. It's still there. So I don't think Pittway is the issue. This is more like Marathon, which, you know, Elger overruled. And in Marathon, there was a pipe, and it had defective gaskets. And so what they had to do is they went in, and they cut around the defective gaskets, and they pulled that piece of pipe out, and they put it back, and they sued for coverage. And Marathon won. The court said that there was property damage, physical injury to tangible property. And Elger said that was wrong, that there was a physical injury to tangible property because, you know, the gaskets didn't hurt anything other than the gaskets. And so it was still there. It was still okay. So the fact is this is a situation where if you go through the record and you actually look at the individual words and the testimony and what the allegations were, as the district court did in terms of what was argued in the trial briefs and what counsel argued in the underlying lawsuit against L.B. Steele, it's very clear that it's about repairing and remediating because of the cracks that appeared, these fissures that appeared in the columns, in order to make sure that there is not a catastrophe, that something does not happen. Can I ask you to switch gears to the duty to defend? Yes, sir. The Illinois law seems pretty clear that when it comes to the duty to defend, there's no requirement that we look at a complaint and pinpoint language within a complaint that would, you know, bring a claim within a policy. You know, in other words, you should focus more on the possibility of coverage. And what I worry about here is that we're on the duty to defend issue, separate from the coverage issue, is that we're reasoning by hindsight. Okay? In other words, that we go, you know, we spend 20 minutes or so here in the courtroom. We're talking about property damage. And I think, well, is there a possibility of a covered claim? And why isn't the answer to that, yeah, there's a possibility because this canopy structure could maybe shift slightly. Forget a collapse scenario. Everybody's talking about collapse. Collapse seems like a total catastrophe and you should worry about things short of collapse that way. But, you know, a slight, what you could identify as a physical shifting or buckling or sagging at one particular point. And looking at the complaints that were filed in Cook County, that seems possible to me. So if that's right, why no duty to defend? Well, the language in the complaint, I think the, I would take issue respectfully, Your Honor, with the description of Illinois saying that the complaint is not the start, really the center of the analysis on a duty to defend. I think the complaint is, okay, but I think you're absolutely right. That's the so-called eight corners rule, right? But what you're not required to do, at least as I understand it, is to go into a complaint and, you know, look for a language that affirmatively is bringing something within the scope of a policy. You don't have to get that far. I think, Your Honor, that one slight sort of amendment to that is the case law says, obviously, it's not coverage, it's the potential for coverage, obviously. Possibility, potential. The possibility of coverage. But it also has to be a possibility of coverage where there is a theory of recovery that is being alleged that could potentially be covered under the policy. And what was alleged in the city's complaint against Walsh was that numerous of the welds installed by Walsh or by its subcontractors, it's in paragraph 91 of the complaint. Which one are you looking at? There's like a couple of them. The second amended complaint, and I have the parallel sites for the third one.  Okay. Go ahead. The second amended complaint for the court is at 170-11 in the record. And paragraph 91 says, numerous of the welds installed by Walsh or by subcontractors retained by Walsh contained unacceptable amounts of slag, cracks, and other unacceptable AWS flaws and, therefore, did not meet the required industry welding standards. And then paragraph 93 says, as a result of Walsh's failure to weld steel to meet the required minimum welding standards and the Walsh contract requirement, the welding of the canopy has required and will require repairs and increased monitoring and maintenance. Right? So all it says is that it's going to require repairs. And then at paragraph 184, it says that Walsh briefed its contractual obligations by providing welds containing slag. So your position has to be that it's too much to read into that, that the canopy itself might have cracked or it might have needed its own kind of remediation. And I think if you look at the complaint overall, that it does not present a potential for coverage. And the allegations in the third amended complaint are parallel. Were there emails, though, where there were concessions that maybe it did? I remember these emails that they point to. What the emails point to in the claims handling documents, Your Honor, all still, and as the district court pointed out, says, but we don't see any damage. There's no allegation of damage other than the crack to the welds that were done by LB Steel itself. What worries me about your position is, these are my words, not yours, is that we're reading the complaint at such a level of precision, almost like we're trying to parse an income tax code regulation. And I think, is that consistent with Illinois law's focus on the possibility or the potential for coverage? I mean, we're really parsing this very finely. Your Honor, what I would say is this. This is not a matter of artful pleading or draftsmanship. The complaint, read as a whole, and I'm not saying just parsing individual words, but read as a whole, is it's a breach of contract case against Walsh for not delivering what it promised to deliver. I worry a little bit, too, that we're so reasoning by hindsight and we're so focused on the kind of commercial sophistication of all the relevant players here. And if this case was against, you know, XYZ, you know, small business, we'd be having a very different duty to defend discussion. In other words, I think you're saying this is such a sophisticated commercial project. Everybody knows what's going on with these columns, the fissures in the columns. And therefore, the coverage issue kind of resolves the duty to defend issue. And I'm just not sure that's the way Illinois law works on this. I understand, Your Honor.  Sure, that's fine. And what the actual language in the claims notes was that nothing in the complaint alleges damage other than a minor mention of cracked welds. And so, you know, the insurance company gets the complaint and it looks at the complaint and it sees what's alleged in the complaint. There's all this stuff, though, about, hey, let's lay low here as opposed to defend and defend and reserve rights. You know, you have that option, too, or your clients do. Understood, Your Honor. And again, but that's also in hindsight. In terms of making a determination, I think, for the court about whether there's a breach of the duty to defend or not, it's really based on the record of the complaints and the information that was provided to the insurance company, which didn't suggest anything other than a breach of contract case against Walsh for LB steel and defective parts, which would not be covered. Counsel, does it matter that Illinois' pleading standard is different from the federal pleading standard? In other words, Illinois has a fact pleading standard that requires that all material facts be pled in the complaint versus the federal, obviously, notice pleading standard. Is that something that an insurer considers when they look at a complaint to figure out, you know, whether a plaintiff is required to allege all of the factual allegations that would substantiate its claims? It certainly provides an additional reason to be able to rely on the actual allegations of the complaint in determining whether or not there is a potential for coverage based on the allegations in the complaint. I see I just have a minute left, Your Honor. I think with respect to the property damage issue, that's the only thing that the trial judge ruled on, so that's where we've been talking today. I recognize that the acuity case has come out recently. Obviously, acuity reaffirmed Elger, so in our view, it doesn't really impact the property damage analysis that's happening here today, but if the court were inclined to reach any of the other issues, it would be our position that that would be something that would need to be remanded back to the trial court. Like the 155 issue? Yeah, any of those issues for purposes of addressing any of the issues that the trial court did not previously address. There are no further questions. Okay, very well. Thank you. Mr. Goodman, we'll give you that couple minutes we promised. Thank you very much. You're welcome. I wanted to address a couple of things in rebuttal, and I think if they're important to, as the court noted, there's the risk of reasoning by hindsight on a duty to defend is where there is a potential, where the claims presented, the facts present the potential. This case, on some level, is a lot like acuity, which is a duty to defend case. It was a duty to defend where the allegation is breach of contract, the contractor, the suit was based on allegations that the subcontractors provided defective materials and provided defective workmanship that caused damage, that caused, in this instance, leak to the project. And the Illinois Supreme Court said damage to the project itself, that's not excluded from coverage. Damage to your own work may or may not be excluded. It said for the purposes of the grant of coverage and the duty to defend, we look at that and say that, in fact, there's alleged property damage. Here, again, paragraph, I think it's 102 of the complaint talks about the defects in the Third Amendment complaint, defects in the weld, and the requirement that there be repair. That was the damage that was sought. Those are claims that would trigger certainly a presented potential for defense, and at that point the insurer has an obligation to defend. Or it can do the alternative. It can say we don't believe that there's enough, and we'll take a position that there isn't coverage, and we'll bring a DJ. It did neither of those things. But in this case, I think to look retrospectively and say, well, did the thing ultimately collapse, is not the approach that Illinois takes, as is clear, I think, in acuity, to a duty to defend case. Look at the claims. Is there alleged property damage? Here there is damage. So the canopy is being repaired is what's alleged. I think that under acuity certainly there's a duty to defend at a minimum. Mr. Goodman, regarding the duty to defend, can you point to me the best language for your position that the complaint subsumes or somehow would allow a reasonable person reading it to contemplate that there might be damage to tangible property other than the products that LB provided? Paragraph 102. Are you looking at the third amended complaint? I'm looking at the third amended complaint, paragraph 2. So it's ECF 170.21. Hold on. 102. Let me get there. Okay. And it talks about the welding of the canopy has required and will require substantial repairs to the canopy itself. I think that paragraph 218, identifying the city's damages, talking about repair, I think that paragraph So your position is that wherever you say repair, that means anything reasonably that a person might think of that might fall within the scope of repair? The challenge here is that the complaint itself doesn't say precisely what's being repaired except in paragraph 102. Well, it doesn't say imprecisely what's being repaired either. It just says repair. It says repair, but paragraph 102. 102 is among the general allegations, I believe, about Walsh. So if a plaintiff just says, you know, asking for relief, okay, just provides boilerplate language that, oh, we seek all damages resulting from the allegations alleged, will that always, in your mind, trigger a duty to defend because that reasonable person might think, well, in this case, it could be reasonable that that might have caused damage to this and to that and to that. No, and I think, in fact, you have to look at the actual nature of the things that's being claimed. So, for example, the court talks about the Danver decision. The Danver case is one of the strangest cases that I've ever heard. And so I guess I'm just trying to understand. And so if a court, if a trial court, or we, for that matter, we don't have any engineering experience, and so how are we to know whether or not what the scope of reasonably contemplated repairs might be in a given case? We know here that the city was alleging that the canopy that was built is now going to need to be repaired because of defects in Walsh. That is what the city says in its complaint. That is the clue that, to me, suggests that this is at least potentially within the coverage of the policy, and thus there's a duty to defend. Thank you. Thank you. Okay. Thanks to counsel for both sides. We'll take the appeal under advisement. Thank you.